[Cite as *In re W.G.*, 2022-Ohio-2342.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## JEFFERSON COUNTY

IN THE MATTER OF:

W.G., W.G., and W.G.

Neglected/Dependent Children

---

**OPINION AND JUDGMENT ENTRY**
**Case Nos. 22 JE 0002; 22 JE 0003**

---

Civil Appeal from the
Court of Common Pleas, Juvenile Division, of Jefferson County, Ohio
Case Nos. 2020-DN-00048, 49, 50

**BEFORE:**
Cheryl L. Waite, Carol Ann Robb, David A. D'Apolito, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Amanda J. Abrams*, 125 South 5th Street, Steubenville, Ohio 43952, for Jefferson County Department of Job and Family Services, Children Services Division

*Atty. Eric M. Reszke*, 100 North 4th Street, Sinclair Building, Suite 810, Steubenville, Ohio 43952, for Father W.G. and

*Atty. John P. Laczko*, City Centre One, Suite 975, 100 East Federal Street, Youngstown, Ohio 44503, for Mother T.P.

Dated: June 27, 2022

---

**WAITE, J.**

{¶1} In this accelerated appeal, Appellant W.G. and Appellant T.P. appeal from the judgment of the Jefferson County Court of Common Pleas, Juvenile Division, terminating their parental rights and granting permanent custody of three of their children to the Jefferson County DJFS, Children Services Division ("the Agency"). Appellants contend the Agency did not make reasonable efforts to reunify them with their children. They also argue that the juvenile court abused its discretion and that its determination was against the manifest weight of the evidence. This record reflects that the Agency made the necessary reasonable efforts to reunify the parties with their children. In addition, the record supports the juvenile court's determination that it is in the best interest of the children for Appellants' parental rights to be terminated and for permanent custody to be granted to the Agency. Therefore, for the following reasons, the judgment of the juvenile court is affirmed.

Factual and Procedural History

{¶2} Appellants, who were never married, have five daughters. Each child has the same initials, and they are the same as their father's: W.G.. Only the three oldest daughters are the subjects of this appeal, with dates of birth of 1/25/13, 6/11/14 and 7/13/16.

{¶3} On June 11, 2020, the Agency received a report from the Steubenville Police Department that the previous evening T.P. had been found staggering along Brady Avenue in Steubenville. She had been stopping cars and screaming at passengers. When questioned by police, she stated that W.G. had assaulted her, stolen her phone,

and taken her car keys. She said that he pushed her to the ground and stomped on her head, neck and arms. When he was subsequently questioned by police, W.G. stated that he had been attending a bonfire on Roosevelt Avenue in Steubenville with his five daughters when T.P. arrived, began arguing with him and assaulted him. He told police that he had pushed her, but did not assault her. Police observed scratches and blood on his arm. W.G. told police the five children were still at the neighbor's home on Roosevelt Avenue and under the neighbor's care. When police arrived at the neighbor's residence, they found all five daughters alone, without adult supervision, and the youngest strapped in her car seat in the car in the driveway. Both parents were taken into custody for domestic violence and the children's paternal grandmother, J.G., was contacted and took custody of the children pursuant to an out-of-home safety plan. According to the plan, all five children were to remain in J.G.'s care. Appellants were permitted only supervised visitation with the children, and no overnight visitation.

{¶4} Karina Montague ("Montague") was assigned as the caseworker in the matter on June 23, 2020. A case plan was established with the following goals: (1) the parties were to complete a 12-week parenting class; (2) T.P. was to maintain compliance and clean drug tests due to her history of heroin addiction; (3) W.G. was to maintain regular counseling appointments; (4) W.G. was to continue taking all prescribed medications; (5) W.G. was to have a psychological evaluation; (6) the two oldest children were to have regular counseling appointments; and (7) no more incidents of domestic violence between the parents could occur. Subsequently, it was determined that W.G. could not be admitted to the parenting class because of disturbances he had previously caused in group settings due to his mental health issues.

**{¶5}** Only T.P. had been charged with domestic violence for the incident that occurred on June 10. She was released from jail and pleaded no contest to an amended charge of disorderly conduct, a fourth-degree misdemeanor. She was sentenced to 30 days in jail, suspended on condition that she be subject to 180 days of unsupervised probation, completion of 18 hours of community service, and that she comply with the Agency plan. At this time, W.G. requested that the court dismiss a temporary protection order in place against T.P.

**{¶6}** On July 8, 2020, the Agency received a report that the oldest child had disclosed T.P. had physically abused her. She also disclosed to her counselor that she had witnessed T.P. abusing drugs in the home. According to the child, T.P. held her by the hair and slapped her repeatedly for spilling coffee creamer. The child reported that T.P. ingested cocaine in front of her and her sisters, and that sometimes T.P. would argue with other adults about obtaining drugs. In addition, J.G. advised the Agency in early July of 2020 that she and her boyfriend were moving to another residence because of a violent altercation that had occurred between the boyfriend and a neighbor. She told the Agency that the new apartment was too small to house all of the children, and that she could no longer tolerate having T.P. and W.G. in her apartment because of their constant arguing. In fact, she had contacted the police multiple times because of the disturbance caused by the parents. J.G. also admitted that she had let the parents take the children, unsupervised, on more than one occasion. She stated that she had a friend, M.W., who lived in Weirton, West Virginia, who could take the two youngest girls. When J.G. met with Montague in person later in the month, she told the caseworker that the two youngest

were already living with M.W. despite the fact that permission had not been first granted by the Agency.

**{¶7}** As a result, the Agency established a new safety plan. The three oldest girls were to remain in the care and custody of J.G. and the two youngest children were to remain in the care and custody of M.W. The parents were granted supervised visitation with all five children once a week for two hours at the McCollough Children's Home.

**{¶8}** According to Montague's testimony at the hearing, during these weekly visits W.G. would sometimes become hostile toward the staff. The hostility increased during his visits, requiring visitation to be moved to the Agency and for a sheriff's deputy to be present during his visitation. In addition, W.G. had periods where he refused to take his medication, and told Montague, "[b]ecause you're telling me to take my medication, now I refuse to." (Tr., p. 66.)

**{¶9}** The Agency subsequently received a report that J.G.'s boyfriend was using cocaine. Both were asked to submit to drug testing. J.G. complied and tested negative for all substances. Her boyfriend refused to be tested. At that point, the three older children were moved to another safety plan and began to reside with T.P.'s cousin.

**{¶10}** T.P. completed her parenting classes in October of 2020. She also completed her 18 hours of community service and was maintaining clean drug screens. Montague was informed by W.G.'s counselor that he had scheduled regular phone appointments and he appeared to desire treatment. On October 14, 2020, the Agency established an in-home safety plan, allowing the three older children to reside with J.G. and their parents.

{¶11} On November 5, 2020, T.P. called Montague and advised her that she had left all the children in W.G.'s care because she and W.G. "needed to take a break from one another." (Tr., p. 68.) T.P. stated that W.G. was not taking his medication and he was letting the girls use obscenities directed at T.P., including calling her a prostitute and a whore. T.P. advised that she would return home the next day. On the same day, Montague also received a call from W.G., stating that T.P. had relapsed and that he had taken video of T.P. using drugs in front of the children in the home. The following day, Montague and Supervisor Kimberly Thrower ("Thrower") visited the home. They discovered that it was in disarray, with food and garbage littered throughout. The children had not been to school in three days and were not clean. W.G. showed Montague and Thrower a video of T.P. using cocaine in the kitchen in front of the children. The oldest daughter, age 7 at the time, described how T.P. would make a crack pipe out of a ballpoint pen in front of the children. The child told Montague, "All I know is, I shouldn't have to live this way." (Tr., p. 17.) W.G. advised that he had been diagnosed with paranoid schizophrenia, but was not taking his medication.

{¶12} Based on W.G.'s mental health issues, his inability to care for all five children for the three days that T.P. was gone, T.P.'s drug use, W.G.'s failure to remove the children during T.P.'s drug use, as well as the condition of their home, the Agency decided to conduct a police removal of the children that day. W.G. became belligerent and told Montague he would get her fired and that "I will end you." (Tr., p. 18.) T.P. signed 30-day voluntary agreements for care of the three oldest children, effective November 6, 2020. An out-of-home safety plan was maintained for the two youngest children to remain with M.W. in Weirton, West Virginia. At the end of the voluntary care

period, T.P. could not be located to sign a second 30-day agreement for the oldest girls. Therefore, the Agency filed an ex parte order of custody for the children on December 8, 2020. A shelter care hearing was held shortly thereafter, and an order of temporary legal custody was granted to the Agency for the three older children. The Agency filed complaints on December 9, 2020, alleging the children were neglected and dependent pursuant to R.C. 2151.03(A)(2) and R.C. 2151.04(C), requesting temporary custody, and requesting an alternate disposition of protective supervision of the children. A guardian ad litem (GAL) for the children, as well as separate counsel for each parent, was appointed.

{¶13} On January 8, 2021, an adjudicatory hearing was held. The magistrate's decision, issued on January 14, 2021, recommended that the court find the three children to be neglected and dependent. A GAL report was filed during this time recommending temporary custody be granted to the Agency. The trial court adopted the magistrate's decision. On January 22, 2021, a dispositional hearing was held. At its conclusion, the magistrate recommended temporary custody of the minor children be given to the Agency. The trial court adopted the findings of the magistrate on February 5, 2021, concluding that the Agency was making reasonable efforts and that the exigency of the circumstances required the agency to remove the children for their own safety. The court also noted that multiple prior safety plans had been attempted and a prior voluntary care agreement had been in place. The trial court included the newest case plan in its judgment entries, which required: (1) drug and alcohol assessment for T.P. and W.G., including random drug screenings; (2) mental health treatment for W.G., his attendance at all counseling appointments, and that he must consistently take his prescribed

Case Nos. 22 JE 0002; 22 JE 0003

medications; (3) the parties to maintain appropriate housing for the family; (4) compliance with probation and community service terms for the parents, if any; (5) couples' counseling for the parents if they wished to remain together; (6) the parties to maintain a regular income for the family; (7) attendance at supervised parenting visits at the Agency.

**{¶14}** The paternal grandfather filed a petition seeking custody of the three oldest children in March of 2021. On March 22, 2021, the GAL filed a supplemental report recommending custody be granted to the paternal grandfather. A hearing on the petition was held on March 22, 2021. In a judgment entry dated March 26, 2021, the trial court denied the petition, finding that the children had never met the grandfather, had no relationship with him, and that the parents were currently working on their case plan with the goal of reunification.

**{¶15}** At the end of June, 2021, T.P. was discharged from mental health counseling due to noncompliance related to a drug abuse relapse. Her counselor concluded that T.P. needed in-patient drug rehabilitation because she was not capable of maintaining sobriety on an out-patient basis. The counselor also reported that T.P. had given birth to her eighth child on December 30, 2020 when she was at her 25th week of pregnancy. T.P. had tested positive for cocaine at her child's birth. The child was placed in the temporary custody of a family friend. The counselor reported that T.P. was now pregnant with her ninth child, was abusing crack cocaine, and was not able to be located. T.P. had refused in-patient rehabilitation, stating that her diagnosis of bipolar disorder was the source of her problems and not her drug addiction.

**{¶16}** The Agency was informed in August of 2021 that T.P. had also been discharged from the Family Recovery program due to noncompliance with drug treatment since February of 2021, and noncompliance with drug testing since June of 2021.

**{¶17}** On September 13, 2021, the Agency filed motions for permanent custody of the three children, asserting that T.P. and W.G. had not completed their case plan. Specifically, T.P. had not enrolled in the recommended in-patient drug treatment program, was currently abusing cocaine, and was not receiving mental health care. The Agency also contended that W.G. obtained a medical marijuana card but was abusing it by using marijuana in excess of its medicinal value, had stopped taking his prescribed medication which caused him to act erratically, had lost his housing, and the Agency had concerns of domestic violence in the home. It was not clear whether T.P. had housing, because the parents had periods of time where they were separated but then would reconcile. W.G. was residing in a one-bedroom apartment at the time the permanent custody motions were filed and was doing odd jobs for income. T.P. was not employed. The parents had been attending visitation regularly, until the drug relapse. At times during visitation, W.G. would be using his phone and would not engage with the children. T.P. also would not interact with the children. The parents were observed arguing frequently in front of the children during visitation, causing Agency personnel to intervene and redirect their behavior.

**{¶18}** The GAL filed a third report on November 5, 2022, recommending that permanent custody be granted to the Agency.

**{¶19}** A hearing on the Agency's motion was scheduled for November 5, 2022. Counsel for T.P. requested a continuance because T.P. was hospitalized following the

birth of another child. The hearing was set for December 10, 2021. The GAL filed a fourth report prior to the hearing. The report again recommended permanent custody be granted to the Agency. At the hearing, Montague and Thrower testified regarding the parents' behavior and inability to follow the case plan. Montague also testified that J.G. concluded she could no longer care for the children because of her health concerns. Montague testified that she and T.P. had attempted to contact several family members to care for the children, to no avail. She also acknowledged that the paternal grandfather had filed an earlier petition, but had no relationship with the children and W.G. had reported being abused by his father and alleged that he raped W.G.'s mother. After the hearing, the trial court issued a judgment entry granting permanent custody of the three minor children to the Agency, concluding that the Agency had made reasonable efforts to reunite the family, including the use of multiple safety plans prior to removal of the children. The court also found the Agency had worked with the parents to ascertain if there were any relatives willing to care for the children after J.G. concluded she could not care for them, and had assisted both parents to obtain mental health care providers on many occasions. The court also concluded that because of the parents' inability to follow the case plan and to try to work toward reunification, it was in the best interest of the children for permanent custody to be granted to the Agency.

**{¶20}** Appellants filed these timely, separate, accelerated appeals. W.G. raises a single assignment of error and T.P. raises two. For the sake of clarity and because of the overlapping nature of both parties' assignments of error, they will be addressed together.

<u>W.G.'S ASSIGNMENT OF ERROR</u>

<u>Case Nos. 22 JE 0002; 22 JE 0003</u>

THE TRIAL COURT ABUSED ITS DISCRETION IN GRANTING THE AGENCY'S MOTION FOR PERMANENT CUSTODY.

T.P.'S ASSIGNMENT OF ERROR NO. 2

THE JUVENILE COURT'S JUDGMENT GRANTING PERMANENT CUSTODY OF THE MINOR CHILDREN TO JEFFERSON COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶21}** W.G. contends the juvenile court abused its discretion in granting permanent custody to the Agency because it was not supported by the evidence. Similarly, T.P. claims the juvenile court's decision is against the manifest weight of the evidence.

**{¶22}** "[T]he right to raise a child is an 'essential' and 'basic' civil right." *In re Murray,* 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990), quoting *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208 (1972). A parent's interest in the care, custody, and management of his or child is "fundamental." *Id; Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388 (1982). The permanent termination of a parent's rights has been described as, "* * * the family law equivalent to the death penalty in a criminal case." *In re Smith,* 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (6th Dist.1991). Therefore, parents "must be afforded every procedural and substantive protection the law allows." *Id.*

**{¶23}** An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if it is supported by clear and convincing evidence. *In re M.J.,* 8th Dist. Cuyahoga No. 100071, 2013-Ohio-5440, ¶ 24.

Case Nos. 22 JE 0002; 22 JE 0003

The Ohio Supreme Court has defined clear and convincing evidence as "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes,* 25 Ohio St.3d 101, 103-104, 495 N.E.2d 23 (1986).

**{¶24}** Here, the reports from the caseworkers and the testimony at the permanent custody hearing established that Appellants were given multiple safety plans within just a five- to six-month period prior to the children's removal from the home. After the children were removed, the court provided additional out-of-home safety plans, all of which contained the same goals in order to achieve reunification. Both parents were to continue mental health counseling. Initially, both parents complied, but as T.P. relapsed into drug abuse and W.G. refused to take his prescribed medications for his diagnosed paranoid schizophrenia, their participation in counseling waned. T.P. did complete parenting classes early on in the case, but this was, realistically, the only portion of the care plan she completed.

**{¶25}** T.P. was to continue drug treatment, at first as an outpatient and then, after relapsing in June of 2021, on an inpatient basis. According to the record, although she had a period of compliance with random drug screenings, once T.P. relapsed she failed to take any drug tests or get treatment for her addiction, and was still in relapse at the time of the permanent custody hearing despite having given birth to another child during that time.

{¶26} The parties were also required to complete couples' counseling, as they intended to remain together. However, the parents' tumultuous, on and off again relationship, coupled with T.P.'s drug addiction and W.G.'s unwillingness to take his prescribed medications, made couples' counseling untenable.

{¶27} The parties were to maintain sufficient housing for the family as part of the reunification plan. Instead, at the time of the permanent custody hearing, W.G. was living in a one-bedroom apartment and because of the nature of their relationship, drug, and mental health issues, T.P. had periods of homelessness and was missing for periods of time. The parties were also supposed to maintain an income in order to support their family. T.P. was not employed during any time period and W.G. occasionally worked odd jobs to earn income.

{¶28} The parties did attend supervised visitation with the children on a fairly consistent basis and would bring snacks and crafts, but eventually even that was fraught with issues. W.G. became increasingly hostile with the staff during visitation, to the point where the visits had to be moved to the Agency and a sheriff's deputy was posted to monitor W.G.'s behavior. In addition, the parties frequently argued with each other during visitation and ignored the children until being redirected by Agency staff. After T.P. relapsed, when she attended visitation she frequently sat crying and refused to interact with the children.

{¶29} Thus, although Appellants made some progress on portions of their case plan, particularly at the outset, evidence of partial completion of a case plan is clearly relevant to a best-interest determination, but it is not dispositive. *In re T.W.,* 10th Dist. No. 10AP-897, 2011-Ohio-903, ¶ 55. Although T.P. did complete the parenting classes

and both parents had a period of consistency with visitation, Appellants failed to demonstrate that they had attained effective parenting skills and refused to participate in individual counseling, maintain drug treatment, or maintain sufficient income and housing in order to demonstrate that reunification was possible.

**{¶30}** The record in this case reveals there was clear and convincing evidence to support the juvenile court's decision to terminate Appellants' parental rights on the basis of failure to maintain sobriety, complete mental health counseling, secure and maintain adequate housing and employment, or engage in couples' counseling in order to meet the care plan goals toward reunification. The juvenile court did not abuse its discretion in granting permanent custody to the Agency and terminating Appellants' parental rights.

**{¶31}** W.G.'s sole assignment of error is without merit and is overruled. T.P.'s second assignment of error is likewise without merit and is overruled.

<u>T.P.'S ASSIGNMENT OF ERROR NO. 1</u>

THE JUVENILE COURT ERRED IN DETERMINING THE JEFFERSON JFS MADE REASONABLE EFFORTS TO MAKE IT POSSIBLE FOR THE CHILDREN TO RETURN HOME TO THE CARE AND CUSTODY OF APPELLANTS.

**{¶32}** T.P. contends the juvenile court erred in determining the Agency made reasonable efforts to make reunification possible.

**{¶33}** Pursuant to R.C. 2151.419(A)(1):

Except as provided in division (A)(2) of this section, at any hearing held pursuant to *** 2151.353 of the Revised Code at which the court removes

<u>Case Nos. 22 JE 0002; 22 JE 0003</u>

a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency or private child placing agency that filed the complaint in the case, removed the child from home, has custody of the child, or will be given custody of the child has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home.  The agency shall have the burden of proving that it has made those reasonable efforts *** In determining whether reasonable efforts were made, the child's health and safety shall be paramount.

**{¶34}**  "Reasonable efforts" has been defined as "[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed[.]"  *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28.  The standard is not whether the agency did everything possible or even that it could have done more, but whether it made reasonable efforts.  *In re T.S.,* 6th Dist. Lucas No. L-19-1247, 2020-Ohio-2972, ¶ 98.

**{¶35}**  The juvenile court concluded the Agency made reasonable efforts to reunite the children with Appellants.  The Agency utilized multiple in-home and out-of-home safety plans over the course of several months prior to removing the children in an attempt to avoid placing the children in foster care.  However, the persistent drug abuse and mental health issues of the parents and their failure to seek treatment rendered those safety plans useless, requiring the children to be removed.  After the children were removed and placed in foster care, Montague made regular visits to the parties' residence

to discuss the case plan and provided names of multiple providers to assist the parents in seeking the necessary mental health and substance abuse treatment in order to meet the care plan goals. The agency presented multiple exhibits at the permanent custody hearing from providers who monitored Appellants' progress or lack thereof. The Agency also held reviews with the parents over the telephone in order to discuss the case plan goals and progress. Montague also testified that she worked with the family to ascertain whether any relatives were available that would be willing to care for the children after they were placed in foster care. Montague was informed by J.G. that she could no longer care for the children because of health concerns, but stated that J.G. was in contact with T.P. and attended outings with T.P. and the children. Despite these efforts, Appellants' mental health and drug abuse issues did not improve over the pendency of the action or by the time of the permanent custody hearing. Thus, the record indicates there were reasonable efforts at reunification made by the Agency pursuant to R.C. 2151.419(A)(1).

**{¶36}** T.P.'s first assignment of error is without merit and is overruled.

**{¶37}** Based on the foregoing, Appellants' assignments of error are without merit and the judgment of the trial court is affirmed.

Robb, J., concurs.

D'Apolito, J., concurs.

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas, Juvenile Division, of Jefferson County, Ohio, is affirmed. Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

### NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**